Robert A. BUCHAN, et al., Plaintiffs,

v.

The UNITED STATES Defendant.

No. 92–505C.

United States Court of Federal Claims.

Nov. 30, 1992.

Ed Bethune, Bethune Law Firm, Seary, Ark., for Robert A. Buchan.

Anthony J. Ciccone, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C., Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Allen D. Bruns, Asst. Director, for U.S.

## ORDER

ROBINSON, Judge.

Claiming to be members of a class of approximately 318 Special Agents of the Federal Bureau of Investigation (FBI) who were assigned to Atlanta, Georgia, during a disturbance by Cuban detainees from November 23, through December 6, 1987, plaintiffs move this court, pursuant to RUSCFC 23, to proceed with this cause as a class action to determine entitlement to overtime pay for regularly-scheduled overtime work. Defendant opposes plaintiffs' motion, arguing that this court should find that plaintiffs have failed to justify framing this matter as a class action under applicable and binding legal precedents.

## FACTUAL BACKGROUND

The twenty-six named plaintiffs were one of the first FBI teams to arrive at Atlanta to quell a riot by Cuban detainees from the "Mariel boat lift." They left Chicago at 8:00 p.m. on November 23, 1987, and reported to the Atlanta facility at 12:00 a.m., November 24, where they remained on duty until 4:30 p.m. They reported back on duty at 7:00 a.m. on November 25. Later that day, ten party plaintiffs went off duty at 7:00 p.m., while the remaining sixteen agents remained on duty until 12:00 a.m. on November 26.

Thereafter, plaintiffs were divided into two shifts. The ten agents who signed off duty at 7:00 p.m. on November 25 were assigned the 12:00 a.m. to 12:00 p.m. shift, while the remaining sixteen were assigned the 12:00 p.m. to 12:00 a.m. shift. Though plaintiffs received premium pay for night, holiday, and Sunday work, they allege that none of them received premium pay for regularly-scheduled overtime pursuant to 5 U.S.C. § 5542 and 5 C.F.R. Parts 550 and 610.

## DISCUSSION

■ Under Rule 23, this court is given wide discretion in each case to determine "whether a class action may be maintained and under what terms and conditions."

The case history of RUSCFC 23 reveals that the Court of Federal Claims and its predecessors have generally disfavored class actions, reserving them for rare and extraordinary cases. *See O'Hanlon v. United States*, 7 Cl.Ct. 204, 206 (1985). With these general observations in mind, several policy considerations have emerged. *See Saunooke v. United States*, 8 Cl.Ct. 327, 329 (1985).

■ One consideration is that the majority of actions before the Court of Federal Claims involve money judgments.[1] Litigants have a strict burden of proof in proving damages caused by the Government. Judges have, therefore, been unwilling to permit large numbers of claimants to seek redress through class actions, because of the likelihood of speculation in the determination of money damages. Alternatively, consolidation of individual actions, under RUSCFC 42, allows individualized damage determinations.

■ A second consideration concerns the opt-in and opt-out procedures entailed in FRCP 23. *See Quinault Allottee Ass'n v. United States*, 197 Ct.Cl. 134, 140, 453 F.2d 1272, 1275 (1972) (order granting class action certification). Neither the Court of Federal Claims nor its predecessors have utilized the opt-out approach, as it tends to bind parties who have failed to exclude themselves. *See Quinault*, 197 Ct.Cl. at 141, 453 F.2d at 1276. The opt-in approach, on the other hand, as applied in *Quinault*, allows each of the unnamed members of the class the opportunity to appear and include themselves in the suit if each is willing to assume the risks of the suit. This approach resembles permissive joinder in that it requires affirmative action on the part of every potential plaintiff. Also, unidentified claimants are not bound if the case should be ruled in the defendant's favor. *See Cooke v. United States*, 1 Cl. Ct. 695, 697 (1983). Furthermore, the opt-in procedure places the court in the "decidedly uncomfortable position under our system of jurisprudence," *see Cooke*, 1 Cl.Ct. at 698, of inviting potential litigants to

1. 28 U.S.C. Sec. 1491(a)(1).

come forward with claims. Since *Quinault*, these considerations have made the court wary of certifying class action suits, thereby only doing so in extraordinary cases.

### 1. *Standards to be Applied.*

Pursuant to Rule 23, this court "shall determine in each case whether a class action may be maintained and under what terms and conditions." In the case at issue, plaintiffs rely heavily on *Quinault*, which states:

> The practice in class suits (including the prescription of standards for giving actions that characterization) is still flexible and open in this forum.
>
> \* \* \* \* \* \*
>
> [T]he better road to follow, until we are clear as to the shape of the class-suit needs in this court and the functioning of various class-suit devices, is to proceed on a case-by-case basis, gaining and evaluating experience as we study and decide the class-suit issues presented by individual, concrete cases coming up for resolution. If we ultimately adopt a general rule, it will be in the light of this ad hoc experience.

197 Ct.Cl. at 140; 453 F.2d at 1275–1276.

■ Plaintiffs claim that the court in *Quinault* opted for a flexible approach to class action suits. They contend that the criteria announced in *Quinault* "have not been ensconced as a rule of court," and point out that few cases since have presented the issue of a class action. Plaintiffs' contentions are true to a minor extent. Nevertheless, *Quinault* remains an authoritative articulation of the standards to be applied by this court in prospective class action suits.

In *O'Hanlon v. United States*, 7 Cl.Ct. 204 (1985), the court made clear that "[w]hile the current version of RUSCFC 23 contains no express standards for determining when a class action should be certified, this court agrees with its predecessor court, the U.S. Court of Claims, that the proper criteria continue to be those expressed in *Quinault*." *Id.* at 206. Similarly, the court in *Saunooke v. United States*,

8 Cl.Ct. 327 (1985), stated that "[a]lthough the *Quinault* standards now do not merit endorsement as the exclusive criteria for certification, their recognition in *O'Hanlon*, 7 Cl.Ct. at 206, warrants at least their application to the facts of this case." *Id.* at 332. In *Armitage v. United States*, 18 Cl.Ct. 310 (1989), the court stated that the enumerated criteria had "become a reference for subsequent cases." *Id.* at 312. More recently, in *Black v. United States*, 24 Cl.Ct. 471 (1991), the court held that "(t)he court in *Quinault* set forth eight conjunctive criteria for proper certification, all of which must be met." *Id.* at 477.

The eight criteria of *Quinault* are as follows: 1) members must constitute a large but manageable class; 2) there is a question of law common to the whole class; 3) a common legal issue overrides separate factual issues affecting individual members; 4) claims of the party plaintiffs are typical of claims of the class; 5) the Government must have acted on grounds generally applicable to the whole class; 6) the claims of many claimants must be so small that it is doubtful they would be otherwise pursued; 7) the party plaintiffs must adequately and fairly protect the interests of the class without conflicts of interest; and 8) the prosecution of individual lawsuits must create a risk of inconsistent or varying adjudications. *See Quinault*, 197 Ct. Cl. at 140–141, 453 F.2d at 1276.

■ With regard to the first requirement, plaintiffs here contend that the numerosity criterion is satisfied. The class in question includes 318 present and former Special Agents who served at the Atlanta Prison Riot. This court, however, has never had difficulty dealing with hundreds of party plaintiffs or with single plaintiff "test" cases. *See O'Hanlon*, 7 Cl.Ct. at 207; *Bendure v. United States*, 225 Ct.Cl. 573, 574 (1980) (737 claimants); *Acker v. United States*, 223 Ct.Cl. 281, 283, 620 F.2d 802 (1980) (352 claimants). The court, in *Abel v. United States*, 18 Cl.Ct. 477, 478 (1989), held that movants failed to satisfy the numerosity requirement, despite the 1,218 plaintiffs claiming water rights

against the United States. While plaintiffs may be correct in asserting that this group of FBI agents is cohesive, and therefore manageable, the number of prospective participants in the present action does not weigh heavily as a ground to certify this matter as a class action.

Focusing on the second and third criteria, plaintiffs charge that the underlying legal issue in this case—whether plaintiffs are entitled to overtime pay for regularly scheduled overtime work—is a common question of law to the entire proposed class of Special Agents, and that it overrides separate factual issues affecting individual agents. So long as a prospective claimant served as an FBI Special Agent at the Atlanta Prison riot, plaintiffs assert, class members would be easily identifiable. Nonetheless, determination of each member's damages would still remain.[2] In cases where a money judgment was sought against the United States, court have historically favored claimants individually proving money damages.[3] Even if the twenty-six named plaintiffs could prove that they are entitled to regularly-scheduled overtime pay, a question of fact would remain as to whether each of the class members earned or received either regularly scheduled overtime pay or premium pay for their night, holiday, or Sunday work.[4]

Defendant proposes conceptualizing this case as a "test" case. Defendant refers this court to the language in *Armitage* that:

> [A]n employee for the Federal government has an ongoing legal relationship with his or her employer that carries

with it a well-defined administrative apparatus. This may be why the Court of Claims taught that "[t]he test case, brought by one or a few plaintiffs, has been the traditional method of litigating the rights of Government employees in this court."

18 Cl.Ct. at 315, citing *Clincher v. United States*, 205 Ct.Cl. 8, 12, 499 F.2d 1250, 1253 (1974), and *Kominers v. United States*, 3 Cl.Ct. 684, 685 (1983).

Assuming named plaintiffs prove that those agents who participated in the riots are entitled to the overtime pay they seek, the "test case" strategy would allow unnamed claimants to pursue similar entitlements through either administrative or appropriate judicial proceedings. Because each claim is against the United States, the Government would be bound by the doctrine of collateral estoppel in subsequent actions. The outcome of such suits would be contingent upon individualized damage determinations, thereby satisfying the burden of proof requirement.

Shifting to the fourth and fifth criteria of *Quinault*, plaintiffs' contentions are persuasive. This court is convinced that the claims of the named plaintiffs are representative of those of the proposed class. Furthermore, the Government acted on grounds generally applicable to the whole class by denying each prospective class member regularly-scheduled overtime pay for work during the riot.

There is some question concerning the sixth criterion, whether the claims of many of the potential class members are so small they would not be pursued through other

---

**2.** Plaintiffs distinguish the instant case from *Armitage v. United States*, 18 Cl.Ct. 310 (1989). In *Armitage*, federal employees brought an action seeking back pay for two types of premium pay. There were several qualifiers in defining the proposed class, which the plaintiffs speculated would include 100,000 people. Plaintiffs assert that the class certification was denied because of the difficulty in identifying members of the proposed class and the fact that the group in question was not cohesive. Plaintiffs insist that identification of members and the cohesion of the group are issues easily resolved in favor of treating this case as a class action. Plaintiffs, however, fail to take into account the burden each has of proving his or her specific damages.

**3.** Consistent with the principle that waivers of sovereign immunity are narrowly construed, *see, e.g., United Construction Co. v. United States*, 7 Cl.Ct. 47, 50 (1984) (order denying motion for summary judgment), neither the Court of Federal Claims nor its predecessors have ever indicated a tolerance for speculation in damage determinations. *Saunooke*, 8 Cl.Ct. at 329.

**4.** Plaintiffs urge that the likelihood of members of the various SWAT teams from different cities being paid differently is "slim to none." This fact alone adds little to plaintiffs' position.

**226**

channels. The amount in question, the equivalent of about two weeks overtime pay, would likely fail to encourage individual suits. However, a few employees are all that is necessary to create a viable action. *Armitage,* 18 Cl.Ct. at 313.

The seventh criterion is an inquiry into whether the named plaintiffs adequately and fairly represent the interests of the proposed class without conflicts of interest. Because class members may be precluded from raising individual arguments, this court has serious concerns that each member may not be adequately represented by the named plaintiffs.

Finally, the eighth criterion, which this court must consider is whether the prosecution of individual lawsuits will create a risk of inconsistent or varying adjudications. Though the claims of the FBI agents are subject to the concurrent jurisdiction of the federal district court and this court, the risk of inconsistency is remote. Defendant cites the recent decision in *Black,* in which the court held:

> There is little risk, if any, of inconsistent adjudications in different courts, even if each of the potential plaintiffs would elect to file suit separately, because each such suit over $10,000 must be brought in the Claims Court. Even if the suit was for less than $10,000 and therefore brought under the Tucker Act in federal district court, *the Tucker Act requires that appeals from all such actions would be heard by the U.S. Court of Appeals for the Federal Circuit.* Therefore, there would be no danger of split among the circuits.

24 Cl.Ct. at 478 (emphasis added) (citations omitted).

Though the eight criteria of *Quinault* may not be set in stone, as defendant asserts, the cases following *Quinault* rely heavily on them in determining whether to allow a class action suit. This court is persuaded that the facts of this case satisfy only the second, third, and fifth criteria. Though a class action would "spread the burden of litigation and avoid repetitious lawsuits," as plaintiffs argue, there are other options available, such as consolidation of suits under Rule 42 or treatment of this matter as a test case. Plaintiffs' failure to justify framing this matter as a class action compels this court to deny plaintiffs' Motion for Order Determining that Action be Maintained as a Class Action.